AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original     ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| FILED |
|---|
| CLERK, U.S. DISTRICT COURT |
| 7/29/2026 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: _____ asi _____ DEPUTY |

United States of America,

v.

FRANCISCO JAVIER FAVELA-ARMIENTA,
  aka "Chico",
JOSE AURELIO VILLAVERDE-VARELAS, and
NEMESIO GONZALEZ-MARTINEZ,

Defendant(s)

Case No.   2:26-mj-04483-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of July 28, 2026, in the county of Los Angeles in the Central District of California, the
defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Jacob Johanson*
Complainant's signature

Jacob Johanson, DEA Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:     7/29/26

Judge's signature

City and state:   Los Angeles, California

The Hon. A. Joel Richlin, U.S. Magistrate Judge
Printed name and title

AUSA: Barr Benyamin (x6772)

## AFFIDAVIT

I, Jacob Johanson, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint against Francisco Javier FAVELA-ARMIENTA aka "Chico", Jose Aurelio VILLAVERDE-VARELAS, and Nemesio GONZALEZ-MARTINEZ for a violation of 21 U.S.C § 841(a)(1) (Possession with Intent to Distribute a Controlled Substance).

2.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.  All dates and times are approximate.

### II. BACKGROUND OF AFFIANT

3.   I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA") and have been so employed since September 2023.  I am currently assigned to the Southern California Drug Task Force, High Intensity Drug Trafficking Area Group 48 ("HIDTA 48"), which investigates large-scale drug trafficking organizations operating in Southern California and elsewhere.

4.   Before becoming a DEA Special Agent, from August 2018 to November 2021, I was a Police Officer with the Fairfax County Police

Department in Virginia.  I then worked as a Special Agent with the Naval Criminal Investigative Service ("NCIS") from May 2022 to May 2023.  I was hired by the DEA in May 2023 and completed the Basic Agent Training Academy in September 2023.

5.    I have received training on investigating violations of federal drug and money laundering laws, including but not limited to, 21 U.S.C. §§ 841, 846, 952, 959, and 963, and 18 U.S.C. § 1956(a).  I have been trained in various electronic surveillance methods, and in the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the manufacturing, distribution, transportation, storage, and importation of controlled substances and the laundering of drug proceeds.  I have been trained in using a variety of investigative techniques and resources, which include physical surveillance, electronic surveillance, analysis of telephone records, and the use of informants and cooperating sources.  I have been trained in undercover operations and in planning and executing arrest and search warrants.  Based on my experience as a Police Officer and Special Agent, I have become familiar with interviewing and interrogation techniques.

6.    Through my formal training and experience investigating narcotics cases, I have become familiar with the methods drug traffickers use to manufacture, store, transport, and distribute narcotics, and how they collect and launder proceeds from their illegal activity.

### III. SUMMARY OF PROBABLE CAUSE

7.    On March 26, 2026, a DEA Confidential Source ("CS-2") communicated with an unidentified male, later identified as Francisco

Javier FAVELA-ARMIENTA, utilizing the phone number (323) 378-0899. The parties agreed to conduct a deal around 3:00 p.m. at the address of 3265 El Mirage Rd, El Mirage, CA.  On the same day, CS-2 met with FAVELA-ARMIENTA and purchased approximately 20 pounds of methamphetamine from FAVELA-ARMIENTA for $13,000.  FAVELA-ARMIENTA arrived and left the deal location in a black Acura, bearing California license plate 8RCB109 (the "Black Acura"), registered to Adriana Lucia Ruelas, with a registered address of 586 N Westlawn Avenue, Fresno, California 93723.  Subsequent to that, the investigation revealed the Black Acura was tied to the 3265 El Mirage Rd. address and a specific location identified by coordinates 34.608171, -117.779817 and surveilled by law enforcement using Unmanned Aircraft Vehicles ("UAVs").  The surveillance revealed the location was likely a drug laboratory based on observations by law enforcement.

8.   On July 28, 2026, members of HIDTA 48, DEA SRT, Hawthorne Police Department ("HPD") and El Segundo PD ("ESPD") executed a state search warrant at the property located at the coordinates of 34.608171, -117.779817.  As a result of the search warrant, law enforcement personnel found and seized approximately 778.518 gross pounds of suspected methamphetamine, as well as 200 gallons of suspected liquid methamphetamine from the property.  As a result, Francisco Javier FAVELA-ARMIENTA aka "Chico," Jose Aurelio VILLAVERDE-VARELAS, and Nemesio GONZALEZ-MARTINEZ, who were all caught attempting to flee the property, were arrested.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

### A. FAVELA-ARMIENTA Distributes Suspected Methamphetamine to a DEA Confidential Source and Drives to and From the Deal in a Black Accura

9.   Based on my training and experience, review of law enforcement reports, and conversations with other law enforcement agents, I know the following:

10.  Beginning in or around March 2026, a DEA Confidential Source[1] ("CS-1") informed members of the Los Angeles Field Division High Intensity Drug Trafficking Area Group 48 ("HIDTA 48") that he/she was communicating with an unidentified male ("UM1") in Mexico, utilizing the phone number 52-6673686157, who knew of a lab in the Los Angles ("LA") area and could provide CS-1 with bulk methamphetamine for $650 per pound.

11.  On March 25, 2026, CS-1 passed the phone number of another DEA CS[2] (CS-2), posing as CS-1's courier, to UM1 and informed UM1 that CS-2 would purchase 20 pounds of methamphetamine from the lab in LA.

---

[1] CS-1 has no criminal convictions.  CS-1 began to cooperate with the DEA in 2014 after CS-1 was charged with possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1).  CS-1 has received consideration for the aforementioned drug trafficking charge, including deferred prosecution and deferred action on his/her immigration status. Since August 2019, CS-1 has assisted in investigations resulting in the seizure of approximately 50 kilograms of fentanyl, 3.3 million fentanyl pills, 120 kilograms of cocaine, 500 pounds of methamphetamine, and $500,000 in drug trafficking proceeds.  CS-1 has been financially compensated for his/her assistance in these investigations totaling approximately $1,227,310.31.  CS-1 has proven to be a reliable source of information.

[2] CS-2 began working with the DEA in 2024. CS-2 has previously been convicted of Assault with a Deadly Weapon and is cooperating with the government in return for financial compensation, totaling to date approximately $53,330.  CS-2 has proven to be a reliable source of information.

12. On the same day, CS-2 received a phone call from an unidentified male, later identified as FAVELA-ARMIENTA, utilizing the phone number (323) 378-0899. CS-2 via WhatsApp and phone calls with FAVELA-ARMIENTA and agreed to conduct the deal on March 26, 2026.

13. On March 26, 2026, CS-2 and FAVELA-ARMIENTA agreed to meet at the deal location, 3265 El Mirage Rd, El Mirage, CA (the "El Mirage Address"), at around 2:30-3:00 p.m. FAVELA-ARMIENTA informed CS-2 that he was required to conduct the deal at that location because that is where Mexico-based handlers instructed him to do it.

14. On the same day, members of HIDTA 48 and Hawthorne Police Department ("HPD") established surveillance in the area of the El Mirage Address to observe the anticipated sale of 20-pound methamphetamine between CS-2 and FAVELA-ARMIENTA.

15. That same day, at approximately 3:34 p.m., California Army National Guard Counterdrug Task Force Sergeant Ramirez observed the Black Acura, bearing California license plate 8RCB109, arrive to the proposed meet location to meet with CS-2. Sgt. Ramirez observed FAVELA-ARMIENTA exit from the driver's seat of the Black Acura, walk towards the rear passenger side of the Black Acura, grab a box from the Black Acura, walk towards CS-2's vehicle, open the passenger side of CS-2's vehicle, and place the box inside CS-2's vehicle. Shortly after, Sgt. Ramirez observed FAVELA-ARMIENTA return to the Black Acura and depart from the meet location.

16. According to CS-2, FAVELA-ARMIENTA approached the passenger's side window of CS-2's vehicle and asked CS-2 where he/she wanted the box to be placed. FAVELA-ARMIENTA then placed a box which contained a crystal substance stored in plastic bags in the front

passenger's seat of CS-2's vehicle in exchange for $13,000 from CS-2. CS-2 relayed to law enforcement that, after discussing the money, FAVELA-ARMIENTA then entered into the driver's seat of the Black Acura and departed from the location. Following the deal, law enforcement personnel took custody of the box containing the crystal substance and sent it to the DEA's Southwest Regional Lab ("SWRL") for testing. Test results showed that the crystal substance inside the box tested positive for methamphetamine.

17.   Shortly after FAVELA-ARMIENTA departed the deal location, surveillance lost sight of the Black Acura and law enforcement personnel were unable to locate the Black Acura.

**B. Law Enforcement Trace FAVELA-ARMIENTA's Black Accura to a Suspected Drug Laboratory**

18.   On June 2, 2026, Task Force Officer ("TFO") Al Alvarado and I established surveillance in the area of 1371 N Northstar Ave, Colton, CA 92324.  During that surveillance, I observed the Black Acura parked on the street between the properties located at 1371 N Northstar Ave, Colton, CA 92324 and 1377 N Northstar Ave, Colton CA 92324.

19.   On June 3, 2026, TFO Alvarado and I established surveillance in the area of 1377 N Northstar Ave, Colton CA 92324. That day, at approximately 5:39 p.m., I observed the Black Acura park near the intersection of Northstar Ave and Quartermaster St.  Shortly after, TFO Alvarado observed an unidentified Hispanic male ("UM2") exit the driver's seat of the Black Acura.  I then observed UM2 walk to 1377 N Northstar Ave, Colton, CA 92324 and enter the residence.

20. On June 8, 2026, the Honorable Jerry Johnson, San Bernardino County Superior Court Judge, signed a warrant authorizing the installation and monitoring of a tracking device for the Black Acura, for a period of 40 days. On June 10, 2026, members of HIDTA 48 installed a tracking device on the Black Acura. On the same day, law enforcement began receiving tracking data from the tracking device.

21. According to tracker data, on June 18, 2026, at approximately 11:00 p.m., the Black Accura stopped in the area of 195th St E and 200th St E, Lake Los Angeles, CA. The tracker data showed that at approximately 11:08 p.m., the tracker stopped at a property located at the coordinates of 34.608171. -117.779817 (the "Coordinates Location"). The tracker data showed that on June 19, 2026, at approximately 12:00 a.m., the Black Acura departed from the Coordinates Location. At approximately 12:18 a.m., the Acura stopped at the El Mirage Address.

22. According to tracker data, on June 21, 2026, at approximately 12:09 a.m., the Black Acura stopped at the property located at the Coordinates Location. At approximately 1:54 a.m. that same day, the Black Acura departed from the Coordinates Location. Tracker data shows that shortly thereafter, at approximately 2:12 a.m., the Black Acura was in the area of the El Mirage Address. The tracker data did not reveal that the Black Acura stopped at the El Mirage Address; however, I believe that the tracker did not show the Black Acura stop at this address due to the tracker being set to provide location data at two-minute intervals.

23. On July 6, 2026, the Honorable Deirdre H. Hill, Los Angeles County Superior Court Judge, signed a warrant, authorizing the use of

an unmanned aerial vehicle ("UAV") to view the property located at the Coordinates Location.

24.  On July 13, 2026, members of HIDTA 48 and the El Segundo Police Department ("ESPD") executed the warrant and flew a UAV in the area of the Coordinates Location in order to view the property. Using the UAV, law enforcement personnel were able to observe a clear plastic container containing an unidentified liquid, a refrigerator/freezer unit, and plastic buckets inside of the sheet metal structure attached to the trailer on the property.  Law enforcement were also able to locate and identify two vehicles located on the property, namely, a 2003 Chevy Tahoe, bearing California license plate ED61W07, registered to Javier Favela, with a registered address of 13801-14099 Ponderosa Rd, Phelan, CA 92372, and a 2006 Chevy Van, bearing California license plate EE16A29 (the "Chevy Van"), registered to Anthony Garcia, with a registered address of 38519 205th St E, Palmdale, CA 93591.  Law enforcement were able to observe the Chevy Van parked closely to the sheet metal structure with a tarp hanging over the vehicle obstructing sight into the sheet metal structure. Based on my training and experience, I believe this was intentional to restrict sight into the structure.

25.  On July 15, 2026, the Honorable Marcelita V. Haynes, Los Angeles County Superior Court Judge, signed a warrant, authorizing the use of a UAV to view the property located at the Coordinates Location.

26.  On July 16, 2026, members of HIDTA 48 and ESPD executed the warrant and flew a UAV in the area of the Coordinates Location in order to view the property.  Using the UAV, law enforcement personnel

were able to observe an unidentified male ("UM3") manipulating a rifle, large blue plastic barrels, a cooler, a bucket, a fan, and UM3 wearing gloves.  Based on my training experience, I recognize these items as consistent with drug manufacturing and distribution.

27.  On July 20, 2026, members of HIDTA 48 and ESPD again flew a UAV in the area of the Coordinates Location in order to view the property.  Law enforcement personnel were able to observe a rifle with a high-capacity magazine, large blue plastic barrels, multiple coolers, and multiple buckets.

28.  On July 22, 2026, the Honorable Peter Mirich, Los Angeles County Superior Court Judge authorizing a search of the property located at the Coordinates Location.

C. **Law Enforcement Search the Suspected Drug Laboratory, Find Methamphetamine and Drug Manufacturing Tools, and Capture FAVELA-ARMIENTA, VILLAVERDE-VARELAS, and GONZALEZ-MARTINEZ After They Attempt to Flee the Scene**

29.  On July 28, 2026, members of HIDTA 48, DEA Special Response Team, HPD and ESPD executed a search warrant at the property located at the Coordinates Location.  While arriving to the property to execute the warrant, law enforcement personnel observed approximately five males attempting to flee from the location near the area of the sheet metal structure on the property. During the execution of the search warrant, two UAVs were used to surveil the Coordinates Location.  Using the UAVs, law enforcement were able to locate three of the fleeing individuals, and thereby detained Francisco Javier FAVELA-ARMIENTA aka "Chico," Jose Aurelio VILLAVERDE-VARELAS, and Nemesio GONZALEZ-MARTINEZ in the area surrounding the property.  Law enforcement executed the warrant on the property and observed large

quantities of suspected methamphetamine and an active methamphetamine conversion lab.  VILLAVERDE-VARELAS, FAVELA-ARMIENTA, and GONZALEZ-MARTINEZ were then placed under arrest.

30.  As a result of the search warrant, law enforcement personnel found and seized the following suspected meth products:

- 67 plastic bags containing a crystal substance consistent in appearance with methamphetamine located in the kitchen area of the trailer.

- A crystal substance consistent in appearance with methamphetamine located on top of plastic bins located in the kitchen area of the trailer.

- Plastic bags containing a crystal substance consistent in appearance with methamphetamine located inside of four Home Depot boxes located in the kitchen area of the trailer.

- Three bags containing a crystal substance consistent in appearance with methamphetamine located in the kitchen area of the trailer.

- A liquid sample of liquid taken from a black tub located inside of the trailer.

- A black scale containing a white residue located in the kitchen area.

- Five liquid samples taken from black and yellow tubs located inside of the kitchen area of the trailer.

- Two large bags containing a crystal substance located in the sheet metal structure.

- Eight liquid samples taken from eight 34-quart pots located in the sheet metal structure.  A field test was completed on this sample and it tested positive for methamphetamine.

- One large bag containing a crystal substance located inside of a cooler located inside of the sheet metal structure.

- Two large bags containing a crystal substance located inside of the sheet metal structure.

- Two liquid samples collected from two 55-gallon drums.

- A liquid sample collected from a blue drum located inside of a 2003 Chevy Tahoe, bearing California plate ED61W07.

- Nine liquid samples collected from five five-gallon Home Depot buckets, one 57-gallon yellow and black tub, one blue 55-gallon drum, one black 57-gallon tub, and one black tub located in the sheet metal structure.

- One liquid sample collected from a white "Ecolab" drum.

31.  A field test was conducted on a sample of the crystal substance seized from the property at the Coordinates Location.  The sample tested positive for methamphetamine.

32.  In total, the DEA collected and seized approximately 778.518 gross pounds of suspected methamphetamine as well approximately 200 gallons of suspected liquid methamphetamine from the property.  Based on my training and experience and observations, I believe the property was a methamphetamine conversion lab.

### D. FAVELA-ARMIENTA and VILLAVERDE-VARELAS Admit Their Involvement in Manufacturing Methamphetamine and Implicate GONZALEZ-MARTINEZ

33.  Law enforcement interviewed FAVELA-ARMIENTA and VILLAVERDE-VARELAS after their arrests.  In their respective post-Miranda

interviews, FAVELA-ARMIENTA and VILLAVERDE-VARELAS both told agents about their specific roles in the methamphetamine manufacturing process and admitted to knowing that methamphetamine was being produced at the property. VILLAVERDE-VARELAS also told agents that GONZALEZ-MARTINEZ was involved in the methamphetamine production process.

## V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

34.  Based on my training and experience, including my familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.  Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices, and in their homes, cars, garages, and storage units.

c.  Communications between people buying and selling drugs take place by telephone calls and messages, such as e-

mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones or other digital devices, of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d. Drug traffickers often use vehicles to transport their drugs and may keep stashes of drugs in their vehicles in the event of an unexpected opportunity to sell drugs arises.

e. Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences and vehicles.

f. Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes. They also often keep other items related to their drug trafficking activities at their residence, garage, car, and storage units, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

g.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data, and at their homes, cars, garages, and storage units.

h.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

///

///

## VI. <u>CONCLUSION</u>

35.  For all the reasons described above, there is probable cause to believe that Francisco Javier FAVELA-ARMIENTA aka "Chico," Jose Aurelio VILLAVERDE-VARELAS, and Nemesio GONZALEZ-MARTINEZ committed a violation of 21 U.S.C § 841(a)(1) (Possession with Intent to Distribute a Controlled Substance).

Attested to by the applicant
in accordance with the
requirements of Fed. R. Crim.
P. 4.1 by telephone on this 29
day of July, 2026.

_____
THE HON. A. JOEL RICHLIN
UNITED STATES MAGISTRATE JUDGE